UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JP MORGAN CHASE BANK, N.A., et al.,

    Plaintiffs,

    v.

MCDONALD, et al.,

    Defendants.

No. 11 C 6902
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

*I. Background*

This case arises from a contentious investment relationship between Counter-Plaintiffs Jeffrey and Shelli McDonald ("the McDonalds"), Counter-Defendants JP Morgan Chase Bank ("JPM Bank") and JP Morgan Securities, LLC ("JPMS") (collectively "JP Morgan"), and Third-Party Defendants John Perry ("Perry") and Erin Ohlms ("Ohlms"), both of whom were JP Morgan employees in 2007. In 2011, amid a dispute over whether to compel Financial Industry Regulatory Authority (FINRA) arbitration of the McDonalds' grievances against JP Morgan, JPM Bank and JPMS filed a Complaint seeking declaratory and injunctive relief against the McDonalds. After a Seventh Circuit appeal returned the case to this Court in 2015, the McDonalds filed a Counterclaim and Third-Party Complaint alleging eight counts of misconduct including fraud, negligence, breach of contract, breach of fiduciary duty, and violation of four separate Indiana and Illinois consumer protection statutes. Counter-Defendants and Third-Party Defendants have filed a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

1

*II. Standard of Review*

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) does not test the merits of a claim, but rather the sufficiency of the complaint. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). In deciding a 12(b)(6) motion, the court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the plaintiff. *Id.* at 1521. To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "A complaint should not be dismissed for failure to state [a] claim unless it appears beyond doubt that the plaintiff is unable to prove any set of facts which would entitle the plaintiff to relief." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 546, 127 S.Ct. 1955, 1959 (2007).

*III. Statement of Relevant Facts*

The McDonalds, a married couple from Carmel, Indiana, met John Perry in late 2006 or early 2007 when he was an investment advisor and Vice President with JP Morgan. The McDonalds told Perry they wanted a conservative, safe, and liquid investment portfolio. On Perry's advice, the McDonalds began investing with JP Morgan, opening an investment account with JPM Bank and a brokerage account with JPMS in July 2007.

The day the McDonalds opened their JP Morgan accounts, Perry provided them with a copy of the Discretionary Portfolio Mandate ("DPM"), which described their investment goals. The DPM highlighted the McDonalds' general concerns with "Liquidity," "Income Shortfall," and "Benchmark Underperformance," among other factors, but did not impose specific investment restrictions or instructions. The document also outlined "Strategic Asset Allocation Guidelines" that included a suggestion of investing 14% of the McDonalds' savings in "Hedge Funds." At some point—the briefs do not indicate when—Jeffrey McDonald circled this 14%

allocation and wrote "too high" in the margin, but he ultimately signed the document without revising that section. The McDonalds also allege that the DPM's allocation between stocks and bonds was more heavily weighted toward stocks than the McDonalds had requested. After the McDonalds explained their concerns to Perry, he introduced them to Erin Ohlms, a Chicago-based JP Morgan Director who, along with Perry, encouraged the McDonalds to invest more aggressively in the stock market.

Despite their concerns, the McDonalds invested almost $6.5 million with JP Morgan in 2007. Perry and Ohlms placed nearly all of this money—$6.35 million—in the JP Morgan Global Access Portfolio ("the GAP Fund"), a hedge fund owned and sponsored by JP Morgan and its affiliates. At that time, it had been in existence for less than six months. Perry represented the GAP Fund to the McDonalds as a high-performing fund that would meet the McDonalds' personal investment needs and was staffed by JP Morgan's top talent. JP Morgan regularly collects fees on GAP Fund transactions, though neither Perry nor Ohlms explained this fee structure to the McDonalds.

Counter-Plaintiffs allege that Ohlms signed the necessary documents to invest nearly all of their money in the GAP Fund without ever consulting with her clients or disclosing to them that the GAP Fund was illiquid and relatively untested. Rather, the McDonalds allege both Perry and Ohlms repeatedly assured them of the GAP Fund's liquidity and strong performance history. The remainder of their money was placed in the Apollo VII Onshore Fund, which, like the GAP Fund and contrary to the McDonalds' stated wishes, was illiquid.

In 2008, as the stock market faltered, the McDonalds made repeated inquiries about their investments. Ohlms and Perry reassured them that the GAP Fund could be accessed if necessary. By the fall of 2008, with the financial crisis in full swing, the McDonalds contacted Ohlms and

ordered her to sell the GAP Fund immediately. She agreed, but soon called Jeffrey McDonald back to report, allegedly for the first time, that the investment was illiquid and could not be sold until December 31, 2008. JP Morgan did not begin to liquidate the GAP Fund until early 2009, and did not fully liquidate the fund and distribute the money until the summer of 2009. By that time, the McDonalds had lost over $1.5 million.

*IV. Discussion*

Counter-Plaintiffs assert a breach of contract claim against Counter-Defendants and breach of fiduciary duty claims against Counter-Defendants and Third-Party Defendants. The McDonalds allege that Perry and Ohlms, on behalf of JP Morgan, violated the written contract that laid out the McDonalds' modest investment aims and low tolerance for risk, and in doing so, breached fiduciary duties including the duty to diversify, the duty to keep the customer informed, the duty to clearly explain risks, and the duty to manage the account in accordance with the customer's needs and goals. Counter-Plaintiffs further allege that the Counter-Defendants and Third-Party Defendants' actions constitute negligence and gross negligence. Additionally, Counter-Plaintiffs allege violations of four separate consumer protection acts—the Indiana Uniform Securities Act, Ind. Code § 23-19-1-1, *et seq.*; the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5, *et seq.*; the Illinois Securities Law of 1953, 815 ILCS 5/12; and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (2006). Finally, Counter-Plaintiffs allege fraudulent misrepresentations and omissions regarding the security, liquidity, and risk level of their investment plan.

*A. Choice of Law*

Counter-Defendants and Third-Party Defendants argue that four of these claims—those brought under the Indiana and Illinois statutes—are barred because the parties' General Terms

Agreement contains a choice-of-law clause stating that New York law will govern any disputes. Counter-Plaintiffs reject the choice-of-law clause, arguing that they never signed the General Terms Agreement directly and that anti-waiver provisions in the Illinois and Indiana statutes negate any choice-of-law clause that would foreclose those statutory claims.

A federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Thus, this court will apply Illinois law to determine whether the choice-of-law clause in the General Terms Agreement is enforceable. In Illinois a choice-of-law clause is applicable to disputes arising under the contract unless 1) the contract is invalid or 2) the clause contravenes Illinois' fundamental public policy. *See Medline Industries Inc. v. Maersk Medical Ltd.*, 230 F.Supp.2d 857 (N.D. Ill. 2002); *WTM, Inc. v. Henneck*, 125 F.Supp.2d 864, 867 (N.D. Ill. 2000) (quoting *Maher & Assocs., Inc. v. Quality Cabinets*, 267 Ill.App.3d 69 (1994)).

The parties do not dispute the validity of the underlying contract but disagree as to whether or not the General Terms Agreement was properly incorporated by reference. Under Illinois law, a document is incorporated by reference when the contract shows "an intent to incorporate the other document and make it part of the contract itself." *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 664 (7th Cir. 2002) (quoting *Turner Constr. Co. v. Midwest Curtainwalls, Inc.*, 187 Ill.App.3d 417 (1989)). I find that the parties' General Terms Agreement was validly incorporated by reference into the Investment Management Account Agreement and the Personal Account Application that the McDonalds signed. *See Counterclaim/Third-Party Complaint,* Exhibit 1 (declaring "I have read, understand, and agree to this application, [and] the General Terms for Accounts and Services. . ." and signed by Counter-Plaintiffs); *Counterclaim/Third-Party Complaint*, Exhibit 2 ("This Agreement is subject to the JPMorgan

5

Private Bank General Terms for Accounts . . . (the "General Terms")"). Although Counter-Plaintiffs did not sign the General Terms Agreement itself, it was clearly referenced and intended to be incorporated by the documents which they did sign. Thus, the General Terms Agreement and its choice-of-law clause are enforceable components of the contract.[1]

Furthermore, enforcing the choice-of-law clause does not violate any fundamental Illinois public policy. The McDonalds are Indiana residents and most of the events underlying this case took place in Indiana. Illinois, although a proper forum, is fairly peripheral to this case and has no strong public policy interest in applying its own laws. Moreover, the parties freely signed the agreement, and it was not written in a confusing or misleading way so as to render its application unreasonable or unfair. Finally, the choice of New York in this case meets the test some Illinois courts employ requiring the contractual choice of law location to have "some relationship" to the parties or transaction. *Thomas v. Guardsmark*, 381 F.3d 701, 706 (7th Cir. 2004). JP Morgan is headquartered in New York and its principal executive offices are located there, which is sufficient to eliminate concerns that the chosen jurisdiction is completely disconnected from the parties or the case. Accordingly, New York law will govern this litigation.

### B. The Indiana and Illinois Statutory Claims

The McDonalds argue that even if the choice of law clause is valid, as I have found it to be, the anti-waiver provisions of the Indiana Securities Act and the Illinois Consumer Fraud Act render the choice of New York law unenforceable. They cite the Indiana legislature's provision that any "condition, stipulation, or provision binding a person purchasing or selling a security or receiving investment advice to waive compliance with this article or a rule adopted or ordered

---

[1] In considering a Rule 12(b)(6) motion, the court will generally consider only the "four corners of the complaint." *Marks v. CDW Computer Centers, Inc.*, 901 F.Supp. 1302, 1309 (N.D. Ill. 1995). However, the Seventh Circuit has determined that district courts may also consider documents attached to a defendant's motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim," as the General Terms Agreement is here. *Id.* at 1309 (quoting *Venture Associates v. Zenith Data Systems*, 987 F.2d 429, 431 (7th Cir. 1993)).

issued under this article is void," as well as a similar provision in the Illinois acts. *See* Indiana Code, IC 23-19-5- 9(i); 815 ILCS 505/10c.

However, the Seventh Circuit and several district courts have held that anti-waiver provisions in securities laws do not invalidate choice of law clauses as long as there is a similar remedy available in the chosen jurisdiction. *See, e.g., Bonny v. Soc'y of Lloyd's*, 3 F.3d 156 (7th Cir. 1993), cert denied, 510 U.S. 1113 (1994); *Spenta Enters. v. Coleman*, 574 F. Supp. 2d 851, 857 (N.D. Ill. 2008) (noting that "Overwhelmingly, courts, including the Seventh Circuit, have rejected [the anti-waiver] argument when the chosen forum provides suitable remedies."); *WTM, Inc. v. Henneck*, 125 F. Supp. 2d 864, 868 (N.D. Ill. 2000); *Pong v. American Capital Holdings*, 2007 WL 657790 at *6 (E.D. Cal. 2007) (citing similar decisions from seven different circuit courts). Here, although there is no private cause of action under the applicable New York securities act, Counter-Plaintiffs can still bring their gross negligence and fraud claims in New York, affording them the opportunity to collect the money damages they seek. Thus, Counts Four through Seven arising under Illinois and Indiana statutes are dismissed with prejudice.

### *C. The General Terms Agreement's Exculpatory Clause*

Counter-Defendants JPM Bank and JPMS move to dismiss the breach of contract, breach of fiduciary duty, and ordinary negligence claims under Fed. R. Civ. P. 12(b)(6). Third-Party Defendants join with regard to the breach of fiduciary duty and ordinary negligence claims. They argue that the General Terms Agreement contains an exculpatory clause that bars all claims other than gross negligence and willful misconduct. Specifically, they point to the following large, bolded phrase in the General Terms Agreement: "Except as otherwise provided by law [the Bank's] sole liability and that of Morgan Affiliates to [the McDonalds] for any wrongful act or failure to act in connection with any of the products or services provided to [the McDonalds]

7

shall be any direct damages [the McDonalds] incur because of [the Bank's] gross negligence or willful misconduct."

Exculpatory clauses are valid and enforceable in New York as long as they do not bar claims for gross negligence. *Champion Home Builders Co. v. ADT Sec. Services, Inc.*, 179 F.Supp.2d 16, 23 (N.D.N.Y. 2001). Here, because the General Terms Agreement permits claims of gross negligence and willful misconduct, it is valid and enforceable. I find that the exculpatory clause does bar Count I (breach of contract) and Count II (breach of fiduciary duty), neither of which contains allegations of gross negligence or willful misconduct. Likewise, the ordinary negligence component of Count III (negligence and gross negligence) is barred. Each of these claims is dismissed with prejudice.

### D. The Gross Negligence Claim

New York law defines gross negligence as "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *AT & T v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996) (quoting *Colnaghi, U.S.A., Ltd. v. Jewelers Protections Servs., Ltd.,* 81 N.Y.2d 821, 823-24 (1993)). Recklessness in this context is defined as "'an extreme departure from the standards of ordinary care,' such that 'the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 61 (2d Cir. 2012) (quoting *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 454 (2d Cir. 2009)). Drawing all reasonable inferences in favor of the plaintiff, I find that the McDonalds have a colorable claim of gross negligence.

Counter-Defendants and Third-Party Defendants' decision to invest nearly all of the McDonalds' money in a single illiquid fund (the GAP Fund) is an "extreme departure from the standards of ordinary care" in the securities industry, as they not only failed to diversify their

8

client's investments but also ignored the McDonalds' express orders to build a conservative, low-risk portfolio. A court could plausibly find it was extreme and reckless to invest more than 97% of the McDonalds' money in a single fund given the McDonalds' investing preferences and Jeffrey McDonald's discomfort with a mere 14% concentration in one fund. Moreover, even if Jeffrey McDonald hadn't taken issue with the 14% figure, investing nearly everything in a single fund was a stark departure from the numbers the parties had previously discussed. Finally, although the DPM noted that liquidity was important to the McDonalds, the GAP Fund was illiquid, rendering this investment choice even more risky and straying even farther from the guidelines laid out in the parties' contract. Counter-Defendants and Third-Party Defendants' motion to dismiss this count is denied.

### *E. The Fraudulent Misrepresentation and Omission Claim*

To recover for fraud under New York law, a plaintiff must show: "(1) a misrepresentation or a material omission of fact which was false and known to be false by defendant; (2) made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury." *King County, Wash. v. IKB Deutsche Industriebank AG*, 916 F.Supp.2d 442, 447 (S.D.N.Y. 2013) (quoting *Premium Mortgage Corp. v. Equifax, Inc.*, 583 F.3d 103 (2d Cir. 2009)). The Federal Rules also impose a heightened pleading standard for fraud, requiring the plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). The plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Dexia SA/NV v. Bear, Stearns & Co., Inc.*, 929 F.Supp.2d 231, 238 (S.D.N.Y. 2013) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)).

Counter-Defendants and Third-Party Defendants raise three arguments to defeat the fraud claim. First, they argue that the General Terms Agreement's merger clause supersedes any oral statements or agreements that contradict the contract. Second, they assert that the alleged fraudulent statements are all statements of opinion, not fact. Finally, they raise a particularity argument under Federal Rule 9(b), contending that the Counter-Plaintiffs' description of exactly what was said, by whom, to whom, and at what time is insufficiently specific under the heightened pleading standard. I will address each of these arguments in turn.

The merger clause in JP Morgan's General Terms Agreement states in relevant part:

> This Agreement contains the entire agreement between me, you and all Morgan Affiliates for the Accounts and services described and supersedes any prior oral or written agreements relating to the Accounts opened and services contracted for. No prior conduct, past practice, or oral statement by your officers or employees will modify my or your obligations under the Agreement.

As discussed above, the Counter-Plaintiffs are bound by the General Terms Agreement, which was properly incorporated into the contract they signed. However, the merger clause applies only to prior statements, and Counter-Plaintiffs have alleged that fraudulent statements were also made after the signing of the agreement. For instance, they allege that after signing the contract, Ohlms and Perry repeatedly represented the GAP Fund as liquid and high-performing when in fact it was illiquid and too new to have any kind of performance history. They also allege ongoing omission of information about the fee structure of the GAP Fund. These statements, which post-date and thus are not covered by the merger clause, are the only statements relevant to the fraud claim.

Counter-Defendants and Third-Party Defendants argue that even these post-contract statements are not actionable because they are merely statements of opinion, not "a [knowingly false] misrepresentation or a material omission of fact" as required by New York law. *IKB*

10

*Deutsche*, 916 F.Supp.2d at 447. But statements or omissions about a fund's liquidity, the fee structure or lack thereof of the GAP Fund, and the performance history of a relatively new fund with little history to draw on are all testable statements of fact. Liquidity in particular is unambiguously defined by industry standards as a security that can be sold within seven days at a fair price. *See, e.g.,* SEC Order, In the Matter of JOHN E. BACKLUND et al., Release Nos. 33-7626, IA-1783, IC-23639, File No. 3-9805. While vague or general statements about an investment being "conservative" or "appropriate" for a particular client may not qualify as statements of fact, the alleged statements and omissions about liquidity, the fee structure, and the existence of the GAP Fund's performance history are sufficiently grounded in fact to satisfy the New York standard.

These statements must also meet the heightened pleading requirement of Federal Rule 9(b). Illinois courts have required details such as "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *PharMerica Chicago, Inc. v. Meisels*, 772 F.Supp.2d 938, 955 (N.D. Ill. 2011) (quoting *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008)). This requirement "must be read in conjunction with Rule 8, which requires a short and concise pleading." *PharMerica Chicago*, 772 F.Supp.2d at 955 (quoting *Gelco Corp. v. Duval Motor Co.*, 2002 WL 31875537, at *6 (N.D. Ill. 2002)). Given the difficulty inherent in pinpointing the exact timing and content of oral statements, the Counterclaim and Third-Party Complaint does provide sufficient detail to meet the 9(b) requirements. The allegations identify the parties (primarily Ohlms and Perry, acting as agents for JP Morgan and speaking to the McDonalds), the timing of the statements and omissions (from July 2007 through fall 2008), and the content of the information that was communicated or omitted. Thus, the fraud claim is properly pled and the motion to dismiss this count is denied.

*V. Conclusion*

For the foregoing reasons, Counter-Defendants and Third-Party Defendants' motion to dismiss is granted in part and denied in part. All counts other than the gross negligence and fraudulent misrepresentations and omissions claims are dismissed with prejudice.

ENTER:

*[signature: James B. Zagel]*

James B. Zagel
United States District Judge

DATE: November 6, 2015